Central Standard Life Insurance Company, an Illinois Corporation, Individually, and as Successor Trustee, Under a Trust Created November 19, 1929, Plaintiff-Appellee, v. Ray P. Gardner, et al., Defendants-Appellants.

Gen. No. 47,325.

First District, Second Division.

November 6, 1958.

Released for publication December 16, 1958.

Robert J. Clendenin and Winston, Strawn, Smith & Peterson, of Chicago (Robert J. Clendenin, George B. Christensen, Edward J. Wendrow, of counsel) for appellants.

Edward L. S. Arkema, of Chicago, for Class 1 policyholders-appellees.

Vernon R. Loucks, James L. Henry, of Chicago (Charles O. Loucks, Clarkson W. Loucks, of counsel) for Central Standard Life Insurance Co., plaintiff-appellee.

PRESIDING JUSTICE LEWE delivered the opinion of the court.

Central Standard Life Insurance Company filed a complaint in chancery seeking leave to dispose of certain trust assets and requesting an approval of its accounting of the trust funds available to pay defendants' assessment policies as they become due and that an actuary be appointed to determine the increase in premiums necessary to meet all obligations on these policies.

The cause was referred to a Master and in conformity with the findings and recommendations contained in his report a decree was entered in favor of plaintiff. The court reserved the question of an increase in rates for assessment policyholders until further order of the court.

Defendants, holders of assessment policies designated as Class II in the reinsurance agreement between Bankers Life Assurance Company and preceding owners, appeal. Defendants, holders of legal reserve policies, did not join in the appeal and filed a brief supporting plaintiff's position.

Originally the defendants were insured by Illinois Bankers Life Association, an assessment life insurance

association organized in 1897, which went out of business in 1929. For the purpose of continuing this insurance a trust was created under a reinsurance agreement between the Association and Illinois Bankers Life Assurance Company, a legal reserve life insurance company. The insureds were given the option of remaining on the assessment plan or converting to the legal reserve method. Class II defendants elected to remain on the assessment basis. In 1951, the Assurance Company was reinsured by the plaintiff, which agreed to continue the trust and certain assets were transferred to the trust. The 1951 agreement was approved by Director of Insurance who had made periodic examinations of the Assurance Company after the original reinsurance contract and also of the plaintiff after the second reinsurance agreement was executed. Plaintiff operated its business and administered the trust with the Director's approval at all times. When plaintiff discovered the assessment rate was inadequate to cover all the claims on the assessment policies, this suit was filed.

Basically, only two questions are presented for our consideration: The actual power of the Director and whether plaintiff breached its duty as trustee with respect to the accounting treatment of various asset and expense items specifically discussed later in this opinion.

■ ■ In considering the Director's power, it must be remembered that the business of life insurance has always been subject to a great deal of government regulation because of the public interest involved. The state usually controls this business through the exercise of its police power. People v. Palmer, 363 Ill. 499. The Illinois statutes provide that the Director of Insurance has the power to enforce and execute all the insurance laws of the state as well as the power to make reasonable rules and regulations for the enforce-

ment of such laws. Ill. Rev. Stats. 1957, ch. 73, § 1013. While the powers and duties of the Director are partly administrative or ministerial and partly discretionary or quasi judicial, Burton v. Aetna Life Ins. Co., 229 Ill. App. 517, his powers under the Code are regulatory and not legislative. People v. Hargreaves, 303 Ill. App. 387.

Although the Director cannot adjudicate the rights of the parties here, his past orders and approvals are entitled to consideration on the question of the alleged breach of trust. It is difficult to understand how plaintiff could be guilty of a breach of trust when acting in accord with the Director's orders and with his approval. In any event defendants are late in objecting to plaintiff's activities, which have changed little since the original reinsurance contract which plaintiff's predecessor executed almost 30 years ago.

██ ██ With respect to the second issue, defendants cannot complain that the provisions of the agreement unfavorable to them are breaches of trust. Policyholders may elect to repudiate or to accept the reinsurance, Weil v. Federal Life Ins. Co., 264 Ill. 425, however, policyholders may not accept a part of the contract and reject other parts and thereby impose on the reinsurer the burdens of the contract and deny it the benefits of the provisions which lighten the load it is to carry. Henderson v. Bankers Life & Casualty Co., 323 Ill. App. 59. See also 22 I. L. P., Insurance § 595. It is usually presumed that parties to a contract intend it to be construed in the light of the general customs and practices of the business involved. Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co., 334 Ill. 281; El Reno Wholesale Grocery Co. v. Stocking, 293 Ill. 494. In view of the above rules and plaintiff's compliance with the provisions of the reinsurance agreement and usual insurance practices, we think defendant's contentions are without merit.

435

While prepaid fire insurance premiums and furniture and fixtures were carried at a zero valuation and mineral rights at a nominal figure, all the other trust assets were carried at an inflated book value. It would be inequitable to have two standards of value in a case like this; either the actual market value of all assets or the book value of all assets must be used. Defendants received the benefit of a higher valuation at the time of the original transfer, considering the deflated market values of real estate and securities during the depression years. It is the usual custom of insurance companies to carry prepaid fire insurance premiums and furniture and fixtures at a zero valuation because of their rapid depreciation. It should be noted that the trust did receive the entire proceeds when the mineral rights were sold and their actual value established. We do not think plaintiff breached its duty by this method of valuation.

Defendants complain of plaintiff's treatment of a certain office building belonging to the trust. Plaintiff, at all times, paid interest on the original valuation of the building and also paid taxes and maintenance costs. Plaintiff used the building for its own purposes. Normally trustees do not have the right to lease trust property to themselves. Johnson v. Sarver, 350 Ill. App. 565. However, the question of the trustee not paying adequate rent does not arise here because the trustee must pay only a fixed rate of interest on the building's valuation and is entitled to any income produced. So it actually makes little difference whether the trustee rents the building and keeps the rent, or uses it for its own purposes. Defendants also complain of plaintiff's failure to establish a reserve for depreciation for the building, but plaintiff was merely following the Director's order not to do so. In view of the fact plaintiff paid all the taxes, maintenance costs and other operating expenses, we cannot say that

plaintiff treated defendants unfairly or breached its duty as trustee in this respect.

■ Defendants contend that foreclosure costs on the trust mortgages should not have been capitalized and charged to the trust corpus. However, they do not deny that it is usual practice of insurance companies to capitalize all foreclosure costs into the book value of the real estate that is foreclosed and that the Director approved of this treatment. This method is in accord with Trust Restatement § 233, comment (m) which provides:

". . . where the trust estate includes a mortgage and the mortgagor defaults, the expenses of foreclosure are payable out of principal; and if the trustee purchases the property for the trust on the foreclosure sale and it produces no income, the carrying charges are payable out of principal until it is sold or becomes productive."

Where the property is unproductive, as it was here, the trustee may pay taxes and other expenses from principal. Patterson v. Johnson, 113 Ill. 559. Considering these general rules, plaintiff's treatment of foreclosure costs was not a breach of its trust.

Defendants contend that oil and gas royalties and bonuses received on leases made by plaintiff for the trust, should be treated as principal rather than income and that Illinois law is controlling on this point even though the leases involve property in other states.

■ Since this trust was made in Illinois and administered here and most of the beneficiaries reside here, there can be no doubt that the trust situs is located in this state. The situs of a trust means the place of performance of active duties of trustee. Campbell v. Albers, 313 Ill. App. 152. All matters of administration are determined by the law of the situs. Beale, Conflict of Laws, § 297.2. We agree with defendants that Illinois law is controlling on questions of administration.

437

There is a great diversity of opinion on the question of whether mineral royalties should be treated as principal or income. See annotation in 18 A.L.R.2d 98. The more recent Illinois cases apparently consider mineral royalties as income. The Illinois Supreme Court held oil royalties were income in Ohio Oil Co. v. Wright, 386 Ill. 206, and set out the current view in the following language at page 212:

"In Burnet v. Harmel, 287 U. S. 103, . . . it was determined that royalty from oil or gas wells is income and requires a return as such, and does not constitute a conversion of capital. In Stoddard v. Illinois Improvement and Ballast Co., 275 Ill. 199, we held that a contract providing for royalty on minerals extracted from lands constituted a lease, and that the royalty agreed to be paid constituted rent. . . . accrued royalties are personal property. . . . royalties from mineral leases are held to be rent, and consequently income."

The Court reaffirmed these general principles in People v. Phillips, 394 Ill. 119, with this concise statement at page 122:

"Royalty received from an oil-and-gas lease has been determined and held to be rent. . . . A mining lease is a lease in fact as well as in name."

To the same effect is Central Pipe Line Co. v. Hutson, 401 Ill. 447.

 What causes much difficulty in this area is the failure to distinguish between accrued royalties which are treated as income and unaccrued royalties which are more in the nature of realty. As was pointed out in Hardy v. Greathouse, 406 Ill. 365, at page 372–373:

. . . "Oil in place in the earth is realty, to be sure; but 'oil in place' is not contemplated by the term royalty. . . . royalty, when collected, must necessarily

be personal property in any case." . . . Accrued royalties are personal property.

Keeping this distinction in mind, it is possible to reconcile some of the older cases which defendants rely on, with the current view. For example in Transcontinental Oil Co. v. Emmerson, 298 Ill. 394, relied on by defendants, the court considered whether an oil leasehold was tangible property of a corporation and therefore taxable; the court held it was. It seems clear that the case turned on the nature of the lease rather than the nature of royalties. It has been pointed out that an oil lease did not create a separate taxable estate, yet a mineral deed did. Pickens v. Adams, 7 Ill.2d 283.

When the mineral leases were sold by plaintiff the trust corpus was credited with the entire proceeds; thus the trust received the benefit of the unaccrued royalties in accord with the rule that unaccrued royalties are to be treated as realty or principal. The accrued royalties were income and plaintiff did not breach its trust by treating them as such rather than principal.

Although there is a conflict of authority on the question of whether mineral lease bonuses are income or principal, the better reasoned approach considers bonus as income. As the Supreme Court pointed out, bonus is ". . . in effect a supplement to royalties . . ." and ". . . income from the use of the mineral resources of the land . . . ." Work v. United States, 261 U. S. 352, 357–358. Under federal income tax law bonus is included in the term royalties, which are considered income. Commissioner v. Clarion Oil Co., 148 F.2d 671. A bonus paid to procure an oil lease was held to be income and not purchase money paid for an interest in land in Aldridge v. Houston Oil Co., 116 Okla. 281, 244 Pac. 782. See also Carter v. Rector, 88 Okla. 12, 210 Pac. 1035 and Dixon v. Mapes, 181 Okla. 376, 73 P.2d 1131.

439

The rationale of the opposing view is that bonus is cash consideration paid for the minerals in place, i. e., a part of the realty. However, this is not actually the case since at the time the bonus is given there is no production of minerals, no impairment, diminution or conversion of the realty and the minerals sought may never be found. Therefore it is more reasonable to consider bonus as rent for the use of the land during the period of exploration before minerals are found. It is unreasonable to say that the bonus is consideration for part of the realty when that part is not definitely known to exist and may never be found.

Two older Illinois cases intimate that bonus should go to corpus rather than income. Sewell v. Sewell, 363 Ill. 166; Heyl v. Northern Trust Co., 312 Ill. App. 207. Although these cases have not been overruled, the reasoning in them is no longer followed. These cases both appear to rely on the theory that a mineral lease is a sale of part of the realty. Under this older view even royalties were considered principal rather than rent or income. It is interesting to note though, that in the Heyl case the court stated the pivotal question was "division of this income" after referring to consideration money and royalties.

The more recent Illinois cases have not followed this rationale, as noted earlier in this opinion, but have adopted the view that money received from mineral leases is in the nature of rent. Under the current view a mineral lease is not a sale of part of the realty creating a separate taxable estate, as a mineral deed does. Pickens v. Adams, 7 Ill.2d 283. See also People v. Phillips, 394 Ill. 119 and Ohio Oil Co. v. Wright, 386 Ill. 206.

In light of these principles and decisions we are impelled to hold that the bonus payments were properly included in plaintiff's income, and that inclusion did not amount to a breach of trust.

440

█ We agree with the Director of Insurance, the Master and the Superior Court that plaintiff's accounting and method of handling the reinsurance were at all times proper. In our opinion defendants have not shown that any of plaintiff's activities constituted a breach of its duty as Trustee.

For the reasons given the judgment of the Superior Court is affirmed.

Affirmed.

MURPHY and KILEY, JJ., concur.